# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 5, 2024

Lyle W. Cayce
Clerk

No. 23-40445

Nikola Lupis,

*Plaintiff—Appellant*,

*versus*

City of Texas City; City of Texas City Police Department; Joe Stanton, *Individually*; Officer Matthew Bonner, *Individually*; Officer Veronica De la Garza, *Individually*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:22-CV-101

Before Elrod, *Chief Judge*, Graves, *Circuit Judge*, and Ashe, *District Judge*.[*]

Per Curiam:[†]

Nikola Lupis was detained by Texas City police officers. He alleged under 42 U.S.C. § 1983 that the detention was unconstitutional, in addition

---

[*] District Judge for the Eastern District of Louisiana, sitting by designation.

[†] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

to various Texas state law tort allegations.  The district court dismissed the case after it determined that Lupis failed to plausibly state a claim and denied his motion for leave to amend his complaint.  Because we agree that Lupis failed to state a claim for relief and conclude that the district court did not abuse its discretion in denying Lupis leave to amend his complaint, we AFFIRM.

## I

## A

On the afternoon of June 27, 2020, Texas City police officers Matthew Bonner and Veronica De la Garza attempted to execute an arrest warrant for Mato Lopez at Three Stars Harbor restaurant, a waterfront property owned by Lopez's father, Nikola Lupis.[1]  When Officers Bonner and De la Garza arrived, they found Lupis standing outside the restaurant.  Officer Bonner approached Lupis and asked, "Are you Mato Lopez?"  Lupis replied that he was Lopez's father and that Lopez had just left on a boat.  Lupis then asked Officer Bonner why he was looking for Lopez.  Officer Bonner told Lupis that he had a warrant for Lopez's arrest on an assault charge.  Officer Bonner then warned Lupis of the consequences of concealing and harboring a fugitive.

Lupis denied that Lopez was on the property and began to walk away. Officer Bonner asked Lupis if he had any form of identification on him, and Lupis turned around with his arms spread wide open and replied "no." Officer Bonner told Lupis to "calm down" and that he was conducting an investigation and needed some form of identification to ascertain who he was talking to.  Lupis then turned back around and began walking towards his parked car to get his identification.  Officer De la Garza then immediately

---

[1] All factual allegations are taken as true from the First Amended Complaint, unless otherwise stated.

told Lupis they only needed his name and date of birth and ordered him to "stay here." Lupis complied.

After this, Officer Bonner went to his patrol car, while Officer De la Garza stayed with Lupis. Lupis then walked behind the gate on his business's property and tried to close the gate. Officer De la Garza removed her taser from its holster, threatened that she would tase Lupis, and grabbed the gate handle to hold the gate open. Officer De la Garza then told Lupis that he was being detained. Lupis was then handcuffed and placed into the back of Officer Bonner's patrol car. Approximately six minutes after placing Lupis in Officer Bonner's patrol car, Officer De la Garza opened the door of the patrol car, and Lupis informed him that his handcuffs were too tight and that he could not breathe. The officers, however, kept Lupis in the vehicle.

Soon thereafter, Lupis's wife arrived and gave the officers permission to search the property. Lopez was not found. When the officers returned to the car, approximately seven minutes later, Lupis was trembling, sweating, and gasping for air. Lupis urged Officer Bonner to call an ambulance. An ambulance soon arrived and transported Lupis to a hospital.

B

Lupis filed this lawsuit in Texas state court, alleging that the incident caused physical injuries, post-traumatic stress disorder, flashbacks, nightmares, an inability to sleep, and symptoms of depression, anxiety, and anger. Texas City timely removed the case to the Southern District of Texas. Lupis filed his operative complaint, which names Texas City, the Texas City Police Department, Police Chief Joe Stanton, Officer Bonner, and Officer De la Garza as defendants. Lupis pursued Texas state law tort claims against Officers Bonner and De la Garza, in addition to claims under 42 U.S.C. § 1983 against Officers Bonner and De la Garza, Chief Stanton, the Texas

City Police Department, and Texas City.  Lupis also pursued *Monell* liability claims against Chief Stanton and Texas City.

Officers Bonner and De la Garza and Chief Stanton filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and invoked the affirmative defense of qualified immunity.  Texas City and the Texas City Police Department filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  Lupis filed responses to each motion, arguing that his complaint sufficiently pleaded that he "was falsely or wrongfully detained" without probable cause.

The district court granted Officers Bonner and De la Garza's and Chief Stanton's 12(b)(6) motions to dismiss.  In a separate order, the district court granted Texas City's 12(c) motion for judgment on the pleadings.  The district court also denied Lupis's request for leave to amend his first amended complaint, determining that Lupis failed to show good cause under Federal Rule of Civil Procedure 16(b).

Lupis filed a motion for reconsideration under Federal Rule of Civil Procedure 59(e) and in the alternative under Rule 60(b)(6).  The motion for reconsideration raised new claims, including illegal search, delay in medical care, and false arrest.  In response, defendants submitted Officers Bonner's and De la Garza's body-worn camera footage.[2]  The district court denied

---

[2] When evaluating a Rule 12(b)(6) motion, the court is typically "confined" to the pleadings.  *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023).  However, courts may also consider "any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).  Here, by contrast, Lupis did not append the body camera footage to his complaint or otherwise mention it, and the district court did not consider it.  *Cf. Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (reviewing body camera footage in a motion to dismiss because it was included in the pleadings).  Thus, we do not consider the body camera footage.

Lupis's motion for reconsideration for the same reasons stated in its previous memorandum opinions. This appeal followed. At oral argument, Lupis abandoned the excessive force claims, Texas state law tort claims, and claims against the Texas City Police Department.

## II

"We review 12(b)(6) dismissals *de novo*." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (citing *Walker v. Beaumont Ind. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019)). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible if the plaintiff alleges facts that, accepted as true, allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Arnold*, 979 F.3d at 266 (quoting *Iqbal*, 556 U.S. at 678).

Qualified immunity appeals based on legal error are reviewed *de novo*. *Marks v. Hudson*, 933 F.3d 481, 485 (5th Cir. 2019). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)). "The qualified immunity analysis has two components: (1) whether a plaintiff alleges . . . the violation of a federal constitutional or statutory right; and (2) whether the right in question was clearly established at the time of the alleged violation." *Id.*

We address two issues. First, whether the district court erred by granting Appellees' 12(b)(6) motions to dismiss Lupis's unlawful detention claim. Second, whether the district court abused its discretion by denying Lupis's motion for leave to amend his first amended complaint.

No. 23-40445

A

The district court did not err by granting Appellees' Rule 12(b)(6) motions to dismiss Lupis's unlawful detention claim.

"To state a claim for unlawful detention, a plaintiff must allege: (1) a detention occurred; and (2) the detention was not based on reasonable suspicion supported by articulable facts that criminal activity was occurring." *Coons v. Lain*, 277 F. App'x 467, 470 (5th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

The district court construed Lupis's live complaint "as arguing that the officers detained him in retaliation for protected First Amendment speech." Given that a finding of reasonable suspicion or probable cause generally defeats a retaliatory detention claim,[3] we give priority to addressing whether the officers had constitutional grounds for the detention.

Taking the pleaded facts as true and viewing them in the light most favorable to Lupis, we hold that Lupis's complaint fails to survive a Rule 12(b)(6) motion to dismiss because the detention was lawful: although a detention occurred, the officers had reasonable suspicion justifying it.

1

Lupis meets the first prong of the unlawful detention claim because Officer De la Garza's command to "stay here" while Officer Bonner verified Lupis's identity constituted a seizure.

---

[3] *See Allen v. Cisneros*, 815 F.3d 239, 244–45 (5th Cir. 2016) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 261–62 (5th Cir. 2002)) ("[E]ven where a citizen believes that he has been subject to a retaliatory detention or arrest, if there was reasonable suspicion or probable cause for an officer to seize the citizen, 'the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.'").

When "a claimed seizure lacks physical force, we must analyze the encounter in two steps: whether the officer exerted a sufficient show of authority; and whether defendant submitted to it." *United States v. Wright*, 57 F.4th 524, 531 (5th Cir. 2023). To determine whether an officer exerted a sufficient show of authority, we employ the "free to leave" test from *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980).

In *Mendenhall*, the Supreme Court held that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure . . . would be . . . *the use of language or tone of voice* indicating that compliance with the officer's request might be compelled." *Id.* at 554 (emphasis added) (footnote omitted). However, when an individual has no desire to leave, such as when he is on his own property, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). "[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Id.* at 437 (citation omitted). Again, "no seizure occurs when police ask questions of an individual, [or] ask to examine the individual's identification[.]" *Id.* If an officer, however, conveys a message that compliance with their requests is required, then a seizure has occurred. *Id.*

Officer De la Garza's command to "stay here" exerted a sufficient show of authority. *See Wright*, 57 F.4th at 530. By instructing Lupis not to move, Officer De la Garza intended to place a restraint on his liberty. Moreover, upon receiving this instruction, Lupis remained still—submitting to that show of authority. *See, e.g.*, *United States v. Darrell*, 945 F.3d 929, 933 (5th Cir. 2019) (explaining that compliance with an officer's command to

stop constitutes a seizure). A reasonable person in Lupis's position would not feel free to decline the officer's request to stay still or terminate the encounter. *Cf. Bostick*, 501 U.S. at 436-37. Lupis therefore was detained and meets the first prong of the unlawful detention claim.[4]

2

Lupis does not meet the second prong of the unlawful detention claim, however, because the officers had reasonable suspicion to briefly detain him.

A *Terry* stop like the one at issue here is a brief detention used by officers to investigate suspected criminal activity. *See United States v. Sharpe*, 470 U.S. 675, 685–86 (1985). To justify a *Terry* stop, an officer needs reasonable suspicion. *See Terry*, 392 U.S. at 21, 30. To establish reasonable suspicion, the "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21 (footnote omitted). We review a district court's determination of reasonable suspicion *de novo*. *United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009).

*Terry* stops "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.*

In this case, the relevant period for the assessment of whether the officers had reasonable suspicion is the moments leading up to the seizure—

---

[4] The operative complaint continues with alleged facts about Lupis being handcuffed and placed in the patrol car. But the relevant period for our narrow assessment of the remaining unlawful detention claim must begin and end with when the initial seizure occurred. *Wright*, 57 F.4th at 530.

the time at which Officer De la Garza ordered Lupis to "stay here." *See Wright*, 57 F.4th at 530 (5th Cir. 2023) ("[A] seizure must be justified at its inception." (internal quotation omitted)).

During these pre-seizure moments, Officers Bonner and De la Garza approached Lupis's property to execute an arrest warrant after receiving a call indicating that Lopez's truck was at the property. Upon seeing that the vehicle was, in fact, on the property, they approached Lupis.

Because the officers were lawfully present at Lupis's establishment, they were entitled to engage with him in a consent-based encounter. *See Kentucky v. King*, 563 U.S. 452, 463 (2011). And they did. They asked Lupis if he was Lopez. Lupis replied that he was Lopez's father and that Lopez had just left on a boat. Lupis then asked Officer Bonner why he was looking for Lopez, and Officer Bonner explained that he had a warrant for Lopez's arrest on an assault charge. Lupis again denied that Lopez was on the property, stated that he would not repeat himself anymore, and began to walk away. Officer Bonner then asked Lupis if he had any form of identification on him. Lupis turned around, with his arms and hands spread wide, and answered, "No." Officer Bonner then told Lupis that he needed to provide some form of identification, so that Officer Bonner could verify to whom he was speaking. Lupis turned and began walking toward his parked vehicle.

It was at this point that the seizure occurred: Officer De la Garza told Lupis that they only needed his name and date of birth and ordered him to "stay here." Lupis then stopped, as ordered, and stated his name and date of birth.

The sequence of events leading up to the seizure establishes that the officers had reasonable suspicion to detain Lupis so that they could ascertain whether he was the fugitive they sought. The officers approached Lupis at his business establishment, where they had just found Lopez's car—a place

where Lopez plausibly could have been found. When the officers spoke to Lupis, Lupis asserted that he was not Lopez, stated that he did not want to repeat that fact, and began to walk away toward a vehicle, maintaining that he did not have identification on his person. It is not inconceivable that a fugitive wishing to escape detection would engage in such behavior. We conclude that these are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the officers stopping Lupis so that they could ascertain his identity. *Terry*, 392 U.S. at 21.

To be clear, individuals who are not detained are not required to provide identifying information to police. *See Johnson v. Thibodaux City*, 887 F.3d 726, 733 (5th Cir. 2018) (citing *Brown v. Texas*, 443 U.S. 47, 52-53 (1979)) ("[P]olice officers may not require identification absent an otherwise lawful detention or arrest based on reasonable suspicion or probable cause."). But we have previously held that it is reasonable for an officer to ask to speak to the target of an arrest warrant at a residence and then to request identification from the person to whom they speak so that they can confirm that they are arresting the correct person. *United States v. Roberts*, 612 F.3d 306, 310 (5th Cir. 2010). We held this even in light of the well-established principle that the "area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Florida v. Jardines*, 569 U.S. 1, 7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Consequently, we conclude that it is also permissible for an officer to request identification from a person who reasonably could be the target of an arrest warrant and is attempting to walk away from officers toward his vehicle outside of a business establishment, where privacy expectations are weaker.

Officer safety considerations, which the Supreme Court has stated are "both legitimate and weighty," are pivotal to this conclusion. *Pennsylvania*

*v. Mimms*, 434 U.S. 106, 110 (1977); *see also Terry*, 329 U.S. at 23 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."). Ordering Lupis to stand with the officers for a minute or two while they confirmed whether he was the fugitive they sought was a minimal intrusion that minimized risk of harm to the officers, because it prevented Lupis from moving to an area of the property where he could have concealed a weapon. Furthermore, Lupis was not handcuffed or physically restrained in any way. The officers' command to "stay here" was the "least intrusive means reasonably available to verify or dispel the officer[s'] suspicion in a short period of time." *Royer*, 460 U.S. at 500.

Because the officers' detention of Lupis was based on reasonable suspicion, the district court did not err by granting Appellees' 12(b)(6) motion to dismiss Lupis's unlawful detention claim.

B

Lupis also insists that the district court abused its discretion by denying his motion for leave to amend his complaint because the parties jointly filed a motion to vacate the scheduling order and ten days later, the district court issued its opinion and final judgment. Because the parties jointly filed the motion to vacate, Lupis contends that good cause exists to amend the scheduling order. Lupis's proposed amendment raised three new claims: (1) illegal search; (2) delay in medical care; and (3) false arrest.

"A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Klick v. Cenikor Found.*, 94 F.4th 362, 368 (5th Cir. 2024). "Four factors are considered in determining whether a motion under Rule 16(b)(4) should be granted: '(1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential

prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice.'" *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 328 (5th Cir. 2016) (alterations in original) (quoting *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003)).

Lupis has failed to demonstrate an abuse of discretion by the district court under any of the four factors. Lupis's brief only cites the dates of filings on the docket, suggests that good cause exists, and recites the four-factor test. To be sure, Lupis does not make an argument *at all* about whether the district court abused its discretion.

Although Lupis raised his illegal search and delay in medical care claims at oral argument, these claims fail because they were included only in his Rule 59(e) motion for reconsideration, not the operative complaint. The district court's order on the Rule 59(e) motion explained that Lupis "failed to show good cause to [amend his complaint] nearly one year after the docket-control order's deadline to amend the pleadings had passed." Because the illegal search and delay in medical care claims were not properly before the district court, they are forfeited and will not be considered on appeal. This court has held that a party "forfeits an argument by failing to raise it in the first instance in the district court . . . or by failing to adequately brief the argument on appeal." *Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021); *see also United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992) ("Failure of an appellant to properly argue or present issues in an appellate brief renders those issues abandoned.").

Even if the illegal search and delay in medical care claims were before the district court, Lupis failed to adequately brief those. Lupis merely recites the four-factor "good cause" test without offering any analysis.

No. 23-40445

Accordingly, the district court did not err, much less abuse its discretion, in denying Lupis's motion for leave to amend.

IV

For the foregoing reasons, we AFFIRM.